UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTAGE, INC., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:05cv01809-RWR |
| TIME LINE CONSTRUCTION CORP., | ) |
| Defendant. | ) |

**PLAINTIFF, MONTAGE, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S APPLICATION TO CONFIRM ARBITRATOR'S AWARD AND <u>IN SUPPORT OF ITS MOTION TO VACATE AWARD</u>**

Plaintiff, Montage, Inc. (Montage), submits its Memorandum of Points and Authorities in support of its Opposition to Defendant's Application to Confirm Arbitrator's Award and in support of its Motion to Vacate Award.

### I. Facts

On March 29, 2005, Montage was awarded a contract by the District of Columbia Sports and Entertainment Commission (DCSEC) for the renovation of the athletic fields at Fort Greble Park in Washington, DC. In turn, Montage executed a subcontract (Subcontract) with Time Line Construction Corp. (TLCC), by the terms of which TLCC would completely renovate the site, including the installation of a new baseball field, per plans and specifications. The Subcontract price was $140,000.

TLCC was to complete its work by April 28, 2005. The time period for performance was essential because the DCSEC had planned a grand opening for the ball field for May 17, 2005. The event was tied to the city's celebration of the return of Major League Baseball to Washington, and the

grand opening was to be attended by the Mayor, other DC officials, representatives of major league baseball and members of the press. However, TLCC did not complete the Project by April 28, 2005. Indeed, TLCC's work was so far from complete at the time of the grand opening that Montage had to spray paint green many areas of the outfield to conceal the dead grass and incomplete field.

According to Montage, TLCC failed to provide sufficient manpower or equipment to the Project and what work it did perform was not in compliance with the plans and specifications. Montage contends that TLCC did not properly grade the playing fields, and failed to install the infield with the proper elevations. Further, TLCC brought in fill from another construction project, and the imported fill contained huge stones and other unsuitable material, resulting in unsafe playing conditions. Montage also alleges that TLCC installed sod that dead or dying by the time it was laid at the Project, and what sod that could have survived died because TLCC failed or refused to adequately water it despite the summer heat.

On July 14, 2005, more than two months after the Project was to be completed, Montage terminated TLCC's Subcontract for default. Montage engaged another contractor, Alpine Services, Inc. (Alpine), to redo all of TLCC's work for $136,900, including $29,256 to replace all of the dead sod at the site.

On September 13, 2005, Montage filed the above-captioned suit against TLCC, seeking recovery for the delay to Montage purportedly caused by TLCC, including alleged quality control costs of $5,000, extended home office overhead totaling $54,246.57, and extended field overhead costs of $10,554.92. After crediting TLCC's contract amount of $140,000, Montage claimed losses, costs and expenses in the net amount of $66,701.49.

TLCC filed an answer and asserted a counterclaim against Montage. Because the claims raised by both parties were subject to a binding arbitration provision of the Subcontract, by consent of the parties this Court entered its November 15, 2005 Order staying this matter and compelling arbitration.

The parties competing claims were presented to the Arbitrator at hearing on December 19-21, 2006. On March 1, 2007, the Arbitrator issued his Award of Arbitrator. By the terms of his Award, the Arbitrator awarded TLCC against Montage the amount of $204,869.27, and awarded Montage against TLCC $92,610.00, resulting in a net award to TLCC of $112,259.27.

## II. Argument

### A. Standard of Review.

The applicable statutory grounds for vacating an arbitration award are set forth in the Federal Arbitration Code (Code), 9 U.S.C. § 10:

> (1) Where the award was procured by corruption, fraud, or undue means;
>
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which rights of any party have been prejudiced;
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

None of those grounds would apply here.

Under Section 9 of the Code, any party to the arbitration may apply to the court for an order confirming an award, and, absent good grounds to vacate or modify it, the court has very limited

authority to disturb the award or refuse to issue judgment. *O.R. Securities, Inc. v. Professional Planning Assoc.*, 857 F.2d 742, 746 (11th Circuit 1988) *citing Wilko v. Swann*, 346 U.S. 427, 74 S. Ct. 182, 98 L. Ed 168 (1953).  However, in addition to the four statutory grounds, an arbitration award may also be vacated if the court finds that the award is "arbitrary and capricious" or entering judgment upon the award would be "contrary to public policy." *Borden v. Hammers*, 941 F. Sup. 1170, 1173 (M.D. Fla. 1996) *citing Brown v. Raucher Pierce Refsnes, Inc.*, 994 F. 2d 775, 779 (11th Cir. 1993); *see also Nitram, Inc. V. Industrial Risk Insurers,* 141 F. 3d 1434 (11th Cir. 1994) *cert den.* 525 U.S. 1068, 119 S Ct. 797, 142 L. Ed. 2d 659.

**B.     The Arbitrator's Award Was Arbitrary And Capricious And Without Any Legal Basis Or Credible Supporting Evidence.**

The Arbitrator's award was arbitrary and capricious, and there was no legal basis or credible evidence to support his award.

First, the Arbitrator improperly awarded TLCC $5,364.86, the amount it had claimed for damage resulting from vandalism to TLCC equipment occurring after hours at the job site.  That portion of the award was not supported by any evidence and was in direct conflict with provisions of TLCC's Subcontract.  TLCC asserted that it should be reimbursed for the vandalism because Montage allegedly failed to provide "adequate security" at the job site.  The job was located in an impoverished area of the Washington, where vandalism and other property crimes are common.  It is undisputed that TLCC had visited the job site and knew where the project was located prior to entering into the Subcontract.  Further, under the terms of the Subcontract, TLCC was required to carry insurance, including protection from property damage, and there is nothing in that agreement that obligated

4

Montage to provide any level of security at the job site. TLCC was in breach of its own obligations in failing to carry insurance, and that failure was the obvious actual cause it suffered any loss from the vandalism.

Similarly, the Arbitrator included an award to TLCC of $1,423.12 for street cleaning around the job site. TLCC had submitted two claims for street cleaning, the above claim for cleaning performed by hand, and a second claim for $1,518.00, for street cleaning performed by machine. The Arbitrator awarded TLCC nothing on the latter claim. The evidence at the hearing showed that TLCC was the only contractor working on the project during the time periods it allegedly performed the street cleaning. Under the terms of the Subcontract, TLCC was responsible for cleaning up after itself, including the mud and dirt it tracked into the street from its operations. Despite TLCC's contractual obligations, the Arbitrator awarded TLCC part of its cleaning claim. Moreover, the arbitrary nature of that award is underscored by the fact that the Arbitrator awarded TLCC one and not the other, without any applicable basis for distinguishing between the two claims.

The Arbitrator also awarded TLCC $98,670.00 for fill that TLCC allegedly imported to the project. TLCC demanded payment for 223,200 c.f. of imported fill, claiming that it installed fill in an area totaling 360 feet long, 310 feet wide and 2 feet deep. In rendering his award, the Arbitrator credited TLCC the entire amount of fill claimed, despite the evidence presented at the hearing that it was physically impossible for TLCC to have installed that much fill on the site. It was undisputed that the maximum dimensions of the baseball field were 360' x 255'. (An error in the stated drawing dimensions was discovered during the hearing, and the actual dimensions were verified at the hearing by using the drawing scale.) Then, even assuming that TLCC's vertical dimension was correct, the

maximum amount of fill TLCC could have installed at the project was 183,600 c.f.  (360 x 255 x 2 = 183600 c.f. or 6800 c.y.)

The fill quantities assumed by the Arbitrator were also plainly at odds with the testimony of both parties.  At the hearing, Montage's project manager, Edward Chaney, testified that the fill was placed on only a portion of the athletic field, and TLCC's witness, Raymond Deane, emphatically described the fill as creating a "crown" in the middle and feathered to its edges.  In contrast, TLCC's calculations assume the fill was applied as a 2' deep "box" layered onto the field.

Montage also introduced photographic evidence that established TLCC could not have installed two feet of fill across the entire project site.  There are light stanchions along the entire perimeter of the site to illuminate the field for night games.  Those lights were original and not replaced or moved during the Montage renovations.  If TLCC had layered two feet of dirt across the entire field the bases of the pre-existing light poles would have been buried by two feet.  Instead, the photographs clearly showed that was not the case.

Setting aside the question of quantity, the Arbitrator's award to TLCC in any amount for the fill was not sustainable on the facts presented at hearing.  TLCC's president testified that prior to delivering the fill to the site he had told Mr. Chaney TLCC would not bill Montage for the material.  Instead, TLCC wanted Montage to hire TLCC on another project that was being awarded by the DCSEC.  However, the DCSEC later decided against proceeding with that project and Montage was not able to subcontract any further work to TLCC.

It is also notable that, unknown to Montage at the time, TLCC was also being paid by another contractor to *dispose* of the fill from another job site nearby.  At the hearing, TLCC's president testified

that the price he was charging Montage was "market price" for that imported fill. Later, however, Montage presented uncontroverted evidence that TLCC was actually paid its supplier, Anderson Excavating, to dispose of the fill, which Anderson had removed from a U.S. Navy construction project nearby. Accordingly, even if TLCC deserved payment for the fill, in calculating any *quantum meruit* award for the imported fill the Arbitrator should have at least deducted the amount TLCC received from Anderson Excavating.

Moreover, the Arbitrator's *quantum meruit* award for the fill was improper because TLCC conferred no benefit upon Montage in importing the fill to the project. It was clearly shown at the hearing that, contrary to what TLCC told Mr. Chaney at the time, the fill was not needed and did not add any value to the project. Indeed, Montage received no extra money from the DCSEC for the imported fill.

Finally, the Arbitrator ignored the evidence and law in failing to award Montage all of its claims. It was undisputed that TLCC failed to complete the project on time, delaying Montage at least two months. Montage presented its calculations for extended field and home office overhead that it incurred as a result of that delay. In addition, Montage presented invoices for the extra supervision and quality control expended during the period of delay and when the follow-on contractor replaced TLCC's work. However, despite the clear evidence that TLCC had failed to complete the project on time the Arbitrator awarded Montage *nothing* on its delay claims.

The Arbitrator also failed to award Montage the full amount of what it had paid to Alpine to correct and replace TLCC's work. In correcting TLCC's work, Alpine had to completely "decapitate" the field, re-grade the entire area, replace all of the sod and install a new baseball

7

diamond. Alpine's subcontract price was $136,900. However, without any discernable logic, the Arbitrator awarded Montage only $92,610.00, only a portion of what Montage had paid Alpine.

### III. Conclusion

For the foregoing reasons, the Arbitrator's award is clearly not sustainable on the applicable law and the evidence presented. Under such circumstances, the award was arbitrary and capricious and should be vacated.

        Respectfully submitted,
        MONTAGE, INC.,
        By its attorneys:

_____

Eric R. Stanco
(DC bar No. 456896)
Stanco & Associates
126 C Street, N.W.
Washington, D.C. 20001
(202) 331-8822
(202) 331-9705 (facsimile)