BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **TIMELINE CONSTRUCTION CORP.,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16 110 00268 06** |
| | ) | |
| **MONTAGE, INC.,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

### POST-HEARING MEMORANDUM
### OF TIME LINE CONSTRUCTION CORP.

Timeline Construction Corp. ("Timeline") for its Memorandum in support of the claims made by it against Montage, Inc. ("Montage") states as follows:

### THE EVIDENCE PRESENTED

The construction project, which is the subject matter of the instant proceeding, contemplated the renovation of playing fields at Ft. Greble Park in the District of Columbia ("Project"). The Project represented a design build undertaking among the District of Columbia Sports and Entertainment Commission ("DCSEC" or "Owner"), Alphatec P.C. ("Alphatec"), and Montage. Alphatec prepared a design to accommodate the intent of the owner to produce a "first class playing field" (See the drawings G-1).

However, the cost of implementing Alphatec's designs considerably exceeded the available funding for the project. The resulting changes by the Owner and Montage to the scope of work described by Alphatec's construction documents (plans and specifications) were central to the development of the dispute which is the subject of this arbitration proceeding.

**A.    Sub-Contract Formation and Initial Changes to Scope of Work**

1

On March 1, 2005, Timeline attended a pre-bid meeting with respect to the Ft. Greble Project. Timeline obtained a copy of Alphatec's design for purposes of submitting a price to Montage to perform a portion of the work contemplated by the Alphatec construction documents (plans and specification). Thereafter, Timeline submitted its pricing for its portion of the scope of work to be performed in accordance with Alphatec's design. The testimony of the witnesses and the documents support the following conclusions:

> 1. The scope of work contemplated by Alphatec drawings was modified by deletion of the underground drainage system in the outfield areas and the complete deletion of the irrigation system which was part of Alphatec's design.
>
> 2. These modifications to the scope of work were introduced to the Project without input to the design function from Alphatec.
>
> 3. The changes to the scope of work resulted in a series of proposals from Timeline to Montage to perform a modified scope of work for an ever reducing price so that DCSEC's budget could be met.

The ultimate subcontract scope of work (see Timeline Exhibit 1) modified both the quantity of work (plans) and the specifications with respect to the quality and type of material to be provided by Timeline under its subcontract. It is significant to note the modifications relative to the type of sod, top soil, and fill material limited Timeline's obligations under its subcontract significantly vis-à-vis the original design.

### B.    The Result of the Deletion of the Drainage System and the Need for Importation of Fill

The evidence shows that the deletion of the underground drainage system in the outfield necessitated a design change that was not considered by Montage or the owner when making scope of work changes that ultimately impacted the subcontract formation process.

2

After Timeline had commenced its performance and had initially tilled, fertilized and raked out the entire existing field and was ready to sod, Mr. Cheney and Mr. Coalson discussed the need to provide for drainage for the project. Mr. Coalson suggested that, with the deletion of the underdrain system, there was insufficient fall in the site to create an appropriate slope for the water to drain from the playing fields. Montage's expert from Alphatec, Mr. Heltman's, testimony was instructive on this point confirming that "his design was not constructed and some changes should have been considered by the deletion of the underground drain system." This conclusion is further supported by the proposal of Alpine Services, Inc. ("Alpine") which included the installation of a swale between the left field outfield and the steep bank leading to the playing field to intercept the water from the higher elevation to it. (See Montage Exhibit V).

As a result, Mr. Coalson suggested that the importation of fill material (the subcontract scope of work clearly limited Timeline's obligation in that regard) to raise the field to provide sufficient fall. Mr. Coalson testified that Mr. Cheney stated he needed to check with the "engineer." Mr. Coalson testified that thereafter Mr. Cheney told him the plan was "approved." Although Mr. Heltman apparently never reviewed Timeline's proposal prior to Timeline's importation of dirt, during the arbitration hearing, he testified that TimeLine's solution to import fill to the site was, in his expert opinion, an acceptable resolution to the change in his design.

There was also considerable evidence regarding the specification of the fill material as "unclassified." In this regard, Mr. Coalson testified that he told Mr. Cheney that bringing in classified fill would be very costly. Mr. Coalson then told Mr. Cheney that if he used "*unclassified* fill material," which was the type specified by the subcontract, it would save a lot of money on the project. Mr. Coalson also advised Mr. Cheney that use of the unclassified fill as provided by the

3

Sub-contract might be unsuitable for the field.   In response, Mr. Cheney told Mr. Coalson to use unclassified fill "as long as I can see it to make sure it is OK."

Although the testimony was in some conflict, Mr. Teates confirmed that the generally understood definition of "unclassified material" allowed for the use of material that contained a variety of substances including concrete block and other non-dirt type substances.   Mr. Teates attempted to differentiate between the nomenclature "unclassified material" and the purpose for which the "unclassified material" was being used.   However, that differentiation does not address (i) the agreement between the parties with respect to Timeline's scope of work, i.e. unclassified material where additional material was required, (ii) the testimony that Montage, through Mr. Cheney, agreed to accept "unclassified material" as long as he could approve it as the dirt arrived and (iii) the fact that Montage, through Mr. Cheney did, in fact, accept the unclassified fill material.

While Mr. Chaney contended that he did not approve or disapprove Timeline's proposal and that Timeline was simply performing the subcontract work as it deemed appropriate, Montage's conduct during the importation of dirt and thereafter supports Timeline's position that importation of unclassified material was agreed to and accepted by Montage.   In this regard, the evidence showed that Mr. Cheney, Montage's project manager permitted the importation of a "thirty foot high mountain of [unclassified] dirt" which later covered the entire site at a depth of nearly "two feet." Remarkably, Mr. Cheney's testimony strongly supports Mr. Coalson's testimony and Timeline's invoices regarding the 9,760 cubic yards of fill dirt that was imported by Timeline.   See APP-1 attached hereto.   The evidence also showed that Mr. Cheney helped to stockpile and spread the unclassified fill dirt onto the field without objection and used Timeline's equipment to do so.

Moreover, and as pointed out by Mr. Heltman's July 7, 2005 report (emphasis added), the deletion of the drainage system by Montage also resulted in numerous "bird baths," where run off does not drain away, even though the grading "appears" to conform to the general grading plan:

> While the grading appears to conform in general to the grading plan, there are numerous "bird baths" in the infield and outfield, where runoff does not drain away. *This is a serious problem, because in an effort to reduce cost, the under drainage system has not been installed in the outfield.*

Given the evidence, it is difficult to comprehend Montage's position that it did not approve or assume any responsibility or obligation for the cost of that importation and the effect of that importation of fill material on the Project's performance criteria.   Montage should be required to bear the financial responsibility for the fill importation necessitated by Montage and the owner's design changes and Montage's attendant decision made thereafter with respect to whether it was classified or unclassified.

## C. The Result of the Modification of the Top Soil and Fill Dirt Requirement with Respect to Sod Growth

Montage and the Owner, in an additional effort to save additional money on the project, also modified Alphatec's original design to significantly reduce the top soil requirement.  Mr. Chaney's testimony in regards to the placement of the sod without the use of additional top soil was particularly important.  When asked what was meant by the subcontract language relative to topsoil, Mr. Chaney testified that the subcontract scope of work contemplated that "the sod comes with about a half inch of topsoil" and therefore did not need any top soil to grow.  This simple statement by Mr. Cheney highlighted the failings of the general contractor and owner to understand what was required to ensure the success of the Project.  Montage's own turf expert, Mr. Teates of Alpine, testified that

5

the reduction of the top soil requirement from 4" to less than 1" would likely result in sod failure since there was no top soil on which it could take hold.

Similarly, Mr. Teates also recommended to Montage in his July 28, 2005 Memo to Mr. Cheney (Exhibit W) to "Add topsoil – if 4" of topsoil is spread over the existing soil the grass will have a better chance of even growth and color and for root propagation," noting that if Montage did not add topsoil, the "the sod will have a difficult time rooting, will have a very inconsistent quality and will not wear or grow evenly and will generally look bad."

Mr. Heltman also noted in his July 7, 2005 report the results of Montage's choice of soil classification and sod:

> 5.  * * * The choice of sod, grown in clay soil, appears to have sealed the surface, and cut-off drainage [causing in-field drainage problems].

Almost immediately after Alpine came in on the project, it recommended laying down an "Alpine Sandwich" of topsoil mixture.  Alpine's proposal, which was accepted by Montage, ensured that the new sod placed by Alpine would survive and provide adequate drainage and smoothness.

**D.  The Result of the Modification of the Irrigation System with Respect to Sod Growth**

Also, because of the removal of the Irrigation System from the Scope of work, it was clear that the sod would die without watering.  Even Alpine complained of sod death due to problems it had in watering the sod before the permanent irrigation system was installed.[1]  See September 16, 2005 letter from Alpine to C.T.I Underground, Exhibit 34 ("It immediately became apparent, as the sod was being installed [by Alpine], that there was not adequate water pressure. *In fact, areas of sod died due to lack of water*."); See also Mr. Teates' July 28, 2005 Memo to Mr. Cheney ("One cannot expect the grass to survive, after initial rooting, if water is not available – the water issue is directly

---

[1] Timeline did not experience "pressure" problems because it used a non-pressurized drip-based watering system.

related to the rootzone issue.")(Exhibit W).   The recognized need for watering of the sod is the reason that an $87,915.10 irrigation system -- which was immediately sought by Montage after it removed Timeline from the Project, -- was eventually installed at the site (*See e.g.*, July 26, 2005 letter from Randy Rashall, Irrigation Account Executive for CTI Underground to Montage, Inc. (Exhibit 36); August 3, 2005 Directed Changes to Renovation of Athletic Fields (Exhibit 37)).

Thus, previously Timeline was directed by Mr. Cheney to water the sod based on verbal instructions and even a purchase order (see 6/6/05 Fax from Nanette Stokes to Jackie (Exhibit 32). Again, this sod watering was not otherwise required of it under the sub-contract: the subcontract only required that Timeline water through germination; however, because sod is already germinated, no sod watering is required.   In turn, Timeline charged Montage for this watering work and seeks payment therefor.

As a related issue, after Alpine came to the project, the security on the site was doubled and a perimeter fence was put in.  See e.g., Exhibit Z (invoices for security for site showing a *doubling* of weekly security expenses from and after July 17, 2005).  These precautions were done apparently in response to Timeline's earlier stated concerns so as to ensure that the "ankle twisters," "foot prints" and "motorcycle tracks" caused by children playing in the field's irrigation system and police chasing persons on motorcycles would not lead to further destruction of the sod placed by Alpine.

It is remarkable that after Timeline was removed from the project, Montage promptly doubled security, put in a perimeter fence, included sod watering in Alpine's scope of work and arranged for the installation of the previously deleted irrigation system.   Yet, Montage so readily dismisses Timeline's concerns related to same when they were raised in 2005 and at the arbitration.

**E.     Media Day and Timeline's Timely Performance under the Contract**

7

During April and May of 2005, Montage was receiving considerable pressure from DCSEC to accommodate a media event which ultimately occurred on May 17, 2005. As a result of this pressure, Mr. Cheney put considerable pressure on Montage to complete its performance under the Contract and ensure that the media day was a success. Shortly before media day, Mr. Cheney was providing verbal instructions almost hourly regarding numerous change orders to ensure the success of media day and appropriate kudos to Montage.

By Media Day, Timeline had completed the verbally requested change orders and had also achieved substantial completion of its subcontract scope of work by that date. (See Timeline letter of July 13, Timeline exhibits 26 and 27). This is supported by the evidence including the testimony that all that was required to complete the project was an additional load of in-field dirt to level the field and adjust the pitching mound.

Admittedly, this completion was after the date set forth in the parties' agreement. However, both Timeline and Montage, did not subscribe any importance to the completion date in the subcontract which had already passed prior to the execution of the contract. Montage permitted Timeline to continue to perform the subcontract work without regard to the stated completion date in the sub-contract or demanding that Timeline establish a revised completion date.

### F.    Timeline's Invoicing for its Work and the Change Orders

After Timeline's completion date and in early June, Timeline issued its initial billing under the sub-contract for the contract price and a portion of the change order work that it alleged it had performed (see Timeline Exhibit 19). It is important to note that on June 9, 2005, Montage provided Timeline with the executed subcontract agreement (see Timeline Exhibit 33). It is equally important to note that notwithstanding Montage's denial of its knowledge of the additional work being

8

performed that Mr. Chaney sent Timeline a letter in May of 2005, acknowledging the extra work claims that Timeline was making against Montage under the sub-contract.[2]

There seems no explanation for the apparent lack of any significant developments in the month of June 2005 with respect to Montage's management of its contract with DCSEC. According to Timeline, it was as requested maintaining the field through watering and mowing during the month of June and issued its bills to Montage for that work. Timeline had a purchase order to cover that work but could not produce it because Mr. Chaney borrowed Timeline's records in June 2005 and never returned them. Evidence to support Timeline's representation consists of a fax transmittal which bears the dates of June 6, 2005 and June 9, 2005 which in pertinent part says "Jackie, please read and fax back to me your signature on purchase order." (See Timeline Exhibit 32). This evidence strongly supports Timeline's argument that it was issued a purchase order to do the watering and mowing beyond the scope of its subcontract during the month of June 2005.

### G.    Montage's Termination of Timeline

It appears that during the month of June discussions occurred between DCSEC and Montage with respect to the condition of the Project and the status of the work. By a letter of July 1, 2005, from Montage's counsel, Montage purports to terminate Timeline's subcontract agreement. That notice did not comply with the terms of the subcontract in that it did not provide to Timeline the appropriate cure period nor indicate with specificity the defects in Timeline's work on the Project.

The evidence suggests that Montage had started investigating alternative subcontractors prior to the July 1, 2005, letter. On July 5, 2005, Alpine transmitted its proposal to Montage. (That proposal is attached to Montage Exhibit V to describe the scope of work proposed to be performed

---

[2] The fact that Montage contended in that letter that it had no responsibility for the extra work does not conclude the issue but only presents Montage's position.

by Alpine at the site.)  Mr. Heltman testified that he made a site inspection on July 7, 2005 and prepared a report of his observations. (Montage Exhibit C.) It seems reasonable to deduce from the comments in Mr. Heltman's report and the July 5, 2005 proposal from Alpine that Montage had made a determination by that time to terminate Timeline's sub-contract but failed to communicate the basis on which that decision was being made as part of its initial termination notice.  Of particular note in Mr. Heltman's report is his recommendation in paragraph 1 that "if the Montage intends to retain a new subcontract to re-work the grading, perform a new as-built survey before any new work is done, to have a record of the work done by the first grading subcontractor." For reasons known only to it, Montage failed to prepare an as-built survey of the site as of the July 7, 2005 meeting.

Regardless of the effect of the July 1, 2005, letter, on July 12, 2005 Montage provided Timeline with a copy of the July 7, 2005 report from Mr. Heltman which apparently was the subject, in part, of the July 12, 2005 meeting at the site memorialized in Mr. Heltman's field report of that date.  On July 13, 2005, Montage transmitted its letter to Timeline terminating Timeline's subcontract one day after the July 12th transmission of the July 7, 2005 report from Alphatec. Timeline responded to Montage's complaints by a letter dated July 13, 2005 which appears in both sets of exhibits. (See Timeline Exhibit 26 which contains two July 13, 2005 letters).  Timelines also responded to the termination notice by a July 14, 2005 letter.  (See Timeline Exhibit 27.)  Both of those letters, written contemporaneously with the events, support the conclusion that the change in the scope of work initiated by Montage and DCSEC generated the cause of the difficulties at the project with respect to the condition of the work.

10

It is also important to note that Montage failed to honor its subcontract to promise to pay for the sod by a joint-check (Exhibit 30), first issuing a joint check and then stopping payment on that check after Timeline delivered the sod.

The Fort Greble project was severely underfunded. As a result, the field design had to be modified by Owner and Montage to accommodate budget constraints. Timeline delivered what was required of it under that modified design with additional changes to reflect needed revisions to the design. As Mr. Cheney made clear throughout the project, the Sports Commission was paying for a "Volkswagen, not a Cadillac." Timeline, as instructed, delivered that Volkswagen. Unfortunately, only after Timeline fully performed did Montage realize the problems created by the design changes.

Montage should not be permitted to avoid liability for its own failure to understand the consequences of ill-conceived, budget driven design changes as to irrigation, drainage and soil requirements. Montage should not be permitted to avoid liability for its failure to provide adequate security at the site to prevent intruders and motorcycles on the delicate sod. Montage should not be permitted to avoid liability for its failure to provide a proper irrigation plan to ensure the sod's survivability. Finally, Montage should not be permitted to avoid liability for its conduct after Timeline expended its labor and furnished equipment and material at the expressed insistence and request of Montage.

## LEGAL ARGUMENT

At the conclusion of the hearing the arbitrator identified a number of issues impacting the decision in this case as to which this Memorandum now addresses.

### A.    District of Columbia Law Governs the Contract Between the Parties

Since the testimony was that the contract was negotiated, drafted and executed in the District of Columbia and was performed in the District of Columbia, Timeline concedes that the law that governs the parties' conduct is that of the District of Columbia.

**B.    TimeLine's Change Orders are Not Required to be In Writing Notwithstanding the Requirement for Written Approval in the Parties' Contract**

Central to all of the issues in this case is the extent to which Montage's verbal instructions directing Timeline to perform additional work at the Project waived the written change order approval requirement found in the parties' written agreement.

In this regard, District of Columbia case law is clear that parties by their conduct can readily waive the express written terms of the contract requiring a written change order approval. This rule was aptly stated by the United States District Court for the District of Columbia in *Chatman Elec., Inc. v. Interior Systems, Inc.,* 433 F.Supp.2d 91, 98 (D.D.C. 2006):

> it is the law of the District of Columbia that a provision that requires written approval of change orders does not bar recovery for extra work done upon the oral commands of ISI's agents and employees. *Shapiro v. Bimblich,* 101 A.2d 890, 892 (D.C.1954).

*See also Omni Specialities-Washington, Inc. v. Esprit de Corp.,* 902 F.2d 1009, (C.A. DC 1990).

Thus, under D.C. law, the change orders performed by TimeLine at the direction of Montage are compensable even though they were not accompanied by the written approval otherwise required by contract.

The Court in *Chatman Elec., Inc.* also used an implied contract theory to award recovery to a sub-contractor when the change order work was directed by an agent of the general contractor but was not approved in writing:

> District of Columbia law implies a contract to pay for services performed when 1) valuable services are rendered by the plaintiff, 2) for the person from whom recovery is sought, 3) which services are accepted and enjoyed by that person, 4) under circumstances that

12

reasonably notified the person that the plaintiff, in performing such services, expected to be paid. *United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc.*, 81 F.3d 240, 246-47 (D.C.Cir.1996); *Perles v. Kagy,* 362 F.Supp.2d 195, 202-203 (D.D.C.2005); *TVL Assocs. v. A & M Constr. Corp.,* 474 A.2d 156, 159 (D.C.1984). I have found that those requirements were met here. CEI performed work at ISI's direction, ISI accepted the work, and CEI reasonably expected to be compensated for the work done at ISI's direction. CEI is therefore entitled to be compensated.

Certainly, in the instant case, Timeline rendered valuable services to Montage from whom recovery is sought and Montage accepted those services without payment therefor under circumstances that reasonably informed Montage that Timeline expected to be paid. Representative examples of the work accepted by Montage include the (i) importation of considerable amounts of fill dirt, (ii) the grading of that dirt (no showing has been made by an as-built or other survey the extent to which the project was regraded), (iii) the placement and replacement of sod for media day, (iv) watering of the sod, (v) excavation and placement of stone for the dugouts, and (vi) maintenance cuts for the field.

Accordingly, under either the oral instructions provided to it or under an implied contract theory, Timeline should be compensated for the work it performed under the various verbally ordered change orders. Montage is not permitted under D.C. law to avoid liability for its on-site project manager's conduct after Timeline has expended considerable labor and furnished equipment and material at the expressed insistence and request of Montage.

### C. Under the District Of Columbia Law, Ed Cheney's Oral Instructions to Timeline as Montage's agent and employee Binds Montage

Under DC law, Ed Cheney certainly had sufficient authority as Montage's employee, agent and supervisor to bind Montage to the oral change orders.

It is undisputed that Ed Cheney was Montage's project manager on the site for Montage. See e.g., Exhibit A, Solicitation Offer and Award dated March 28, 2005. Further, it is beyond dispute

13

that Mr. Cheney had considerable responsibility with respect to the project and was given considerable authority to bind Montage. Indeed, Mr. Cheney was noted as the "Person Authorized to Sign Offer" for Montage and actually signed the DCSEC's Solicitation Offer and Award dated March 28, 2005 on behalf of Montage (Exhibit A). He also is noted as the person who prepared the Proposal/Estimate for Contract Modification attached as page 5 of Exhibit A.

After the contract was award was given, Mr. Ostrander with the DCSEC sent to "Montage, Incorporated *** ATTN: Ed Cheney, Project Manager" the DCSEC's March 24, 2005 Notice to Proceed on the Project (Exhibit C).

Once the project commenced, Mr. Cheney was a part of the project from its inception, participating in the initial pre-bid meeting and later negotiating the scope of work with Timeline in his office. All of Montage's concerns regarding the project were conveyed by Mr. Cheney to Timeline. All of Timeline's concerns regarding the projected were conveyed to Mr. Cheney.

During Timeline's performance of its scope of work, Mr. Cheney was one of the only employees that ever appeared on site and, in fact, appeared there quite regularly to direct Timeline's work on behalf of Montage. As Mr. Coalson testified, there were no other supervisors, employees or agents of Montage ever at the site. In fact, Mr. Coalson testified that Mr. Cheney was the only person at Montage that he ever met or had any substantive discussions with at Montage during the course of the project.

Moreover, as testified to by Mr. Coalson, when he discussed changes to the work with the owner's representatives, Virgil Ostrander and Clark, Mr. Cheney told Mr. Coalson that any changes (and costs) needed to be approved by him and that Timeline was to discuss any changes only with

14

him (Cheney). In addition, when Mr. Coalson spoke with Mr. Ostrander regarding change orders, Mr. Ostrander told Mr. Coalson to "get with Ed to get it done."

Even after the project was over, Mr. Cheney played an important management role for Montage. For instance, Mr. Heltman toured the field in July and noted in his July 12, 2005 report that Mr. Cheney was present with a Montage legal representative along with an another unidentified Montage employee, clearly showing Mr. Cheney's management role on the project.

Similarly, Alpine directed all of its correspondence to Mr. Cheney. For instance, after Mr. Cheney showed Alpine the field on July 5, 2005, Mr. Teates directed his report to Ed Cheney. See e.g., July 5, 2005 letter from Mr. Teates to Mr. Cheney. And when Alpine submitted its bid to provide to provide its services, that proposal was submitted to Mr. Cheney. See July 19, 2005 letter from Mr. Teates to Mr. Cheney (Exhibit T). When Alpine had concerns, it dealt directly with Mr. Cheney. (See e.g., Mr. Teates' July 28, 2005 Memo of Issues that Need Response by Tomorrow from Teates to Cheney (Exhibit W)). All invoices from Alpine were also directed to Montage c/o "Ed Cheney" See 8/4/200 and 12/12/05 Statements.

Likewise, Viking Consulting met with Ed Cheney alone at the field for a review of the project and directed its report to Ed Cheney. See e.g., Viking Inspection Report dated July 12, 2005. Even Triton security directed all of its invoices to Mr. Cheney. Similarly, when Montage's legal counsel copied its correspondence to Timeline on Montage, it was copied to Mr. Cheney (as well as a certain Mr. Golpayegani). (Exhibits K and L).

As the court suggested in *Chatman Elec., Inc. v. Interior Systems, Inc.,* 433 F.Supp.2d 91, (D.D.C. 2006), oral instructions by Mr. Cheney, an employee or agent of Montage, will bind Montage:

it is the law of the District of Columbia that a provision that requires written approval of change orders does not bar recovery for extra work done upon the oral commands of ISI's agents and employees. *Shapiro v. Bimblich,* 101 A.2d 890, 892 (D.C.1954).

Similarly, the Municipal Court of Appeals for the District of Columbia in *Shapiro v. Bimblich,* 101 A.2d 890, 892 (D.C.1954) expressly found that the oral instructions of a *construction supervisor*[3] are sufficient to bind the general contractor with respect to change orders:

> Shapiro also contends that no recovery should have been allowed to Bimblich for extras because the contract provided that 'No statements for extras will be honored * * * unless these statements are in accordance with written orders signed by the General Contractor and the Subcontractor.' The trial court found that the extras were performed in accordance with oral orders of Shapiro or his superintendent. This was not denied by Shapiro. The allowance for extras was therefore proper. Such a provision in a written contract does not prevent the parties from making separate parol agreements regarding extras. *Continental Casualty Co. v. Schaefer*, 9 Cir., 173 F.2d 5, *certiorari denied*, 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745, *Macri v. United States*, 338 U.S. 820, 70 S.Ct. 63, 94 L.Ed. 497; T*eer v. George A. Fuller Co.,* 4 Cir., F.2d 30; *Bartlett v. Stanchfield*, 148 Mass. 394, 19 N.E. 549, 2 L.R.A. 625. *See also, Mazza v. Russell*, 47 App.D.C. 87.

Accordingly, under D.C. Law, Montage is fully bound by its project manager, Ed Cheney's, oral instructions to Timeline regarding the numerous change orders he expressly directed.

**D.    The Relevancy of the Scope of Work set forth in Exhibit 24 (Letter of Intent)**

Another issue that the arbitrator raised is whether the Scope of Work set forth in Exhibit 24 or the Sub-Contract (Exhibit 1) controls the parties' contractual relations.

In this regard, there is considerable uncertainty as to the exact scope of work description that governs Timeline's performance under the Sub-Contract. Where there is ambiguity in a written contract, the fact finder may consider extrinsic evidence including parol evidence to explain or amplify on those terms: "Ambiguity in contractual language opens the door to consideration of

---

[3] Notwithstanding his title as project manager, Mr. Cheney was presumably the "General *Superintendent*" on the project (as contemplated by *Shapiro*) as required of Montage by § 1.3 of the

relevant extrinsic materials." *Papago Tribal Utility Authority v. Federal Energy Regulatory Commission*, 610 F.2d 914, 929 (C.A.D.C. 1979).

Accordingly, the arbitrator is permitted to consider exhibit 24 to analyze the intention of the parties with respect to Timeline's scope of work when they entered into the Sub-Contract.

### E.     Montage Failed to Appropriately Terminate the Contract as Required

As set forth above, Montage also failed to terminate the contract as required under the express terms of the contract. Specifically, by letter of July 1, 2005, from Montage's counsel, Montage purports to terminate Timeline's subcontract agreement. However, that notice was defective and did not comply with the terms of the subcontract in that it did not provide to Timeline the appropriate cure period nor indicate with specificity the defects in Timeline's work on the Project. Therefore, Montage wrongfully terminated Timeline from the project.

### F.     Montage was the Contractor under the Drawings

Another issue of concern that was raised by the arbitrator was whether Montage was the Contractor under the Drawings presented as Exhibit 1. In this regard, a plain reading of the four corners of the document mandate that Montage was the Contractor. Indeed on the first page of the drawings, Montage is specifically identified as the "Contractor." Moreover, when asked to review the drawings based on his considerable years in the industry, Montage's own expert, Mr. Teates testified that Montage would be the "Contractor" under the drawings and that Montage would be the entity required to establish control lines under the drawings (as was also testified to by Mr. Coalson). Certainly, Montage cannot expect to rise above its own expert's testimony in that regard and now hold Timeline responsible for problems with grading when it failed to establish control lines on the project in the first place.

---

original Specifications.

G.    **Relevancy of Exhibits 22, 23 and the Kenilworth Park Project.**

Another issue that was raised by the arbitrator was the relevancy of Exhibits 22 and 23 as well as the Kenilworth Park Project.

While Exhibits 22 and 23 are not controlling, they do suggest and flavor the course of negotiations between the parties in arriving at the ultimate agreement between them.  In that regard, they can be useful to help resolve ambiguities that might exist in the sub-contract.  In addition, they highlight the parties' variance from the drawings and specifications with respect to the design that was originally contemplated by the Owner.  Beyond that, those documents are not per se relevant to the arbitrator's ultimate decision.

With respect to the Kenilworth Project, there is some relevancy related thereto since certain of the arrangements between Montage and Timeline were reached based on Timeline's understanding that Timeline would receive work related thereto as promised by Mr. Cheney to Timeline.  Because the Kenilworth Park project work was ultimately not awarded to Timeline, Timeline has, in effect, a quantum meruit / unjust enrichment claim for work performed on the instant project.

H.    **Counter Claim**

Montage suggests that it is entitled to recover a counterclaim from Timeline in the amount of the Alpine and Viking costs.  The direct answer to Montage's contention is that Alpine did not perform the scope of work contemplated by Timeline subcontract and there is little evidentiary basis to determine what, if any, portion of the Alpine expense represents work performed by Alpine to remedy any defective work of Timeline.  Montage's representation from Viking testified that the sodding system employed at the site was different than that contemplated by the Montage

18

subcontract in that it was the "Alpine sandwich". Clearly those costs could not be chargeable to Timeline under any theory of damage computation.

Furthermore, in July of 2005, Montage negotiated a change order with DCSEC which introduced into the Project the irrigation system that it previously deleted. (Timeline Exhibits 36 and 37). The installation of that irrigation system necessitated the excavation of part or all of the sub-grade that Timeline had installed under its subcontract. Clearly, Montage knew during the month of July that it was going to do that work in that the quotation from CTI was part of the change order made by Montage and the DCSEC increasing Montage's scope of work. Part, if not all of Alpine's work, was required in order to introduce the irrigation system to the Project after all of Timeline's work had been completed. It is reasonable to infer that the reason the irrigation system was introduced to the Project, notwithstanding its original deletion, was the recognition that the "sod" would not grow without an appropriate irrigation system in the Project. Regardless of the reason, the Alpine work would have been required to accommodate the introduction of the irrigation system into the outfield area.

Even if part of the Alpine work was chargeable to Timeline for correcting deficient or incomplete work of Timeline, it is important to note that Montage paid nothing to Timeline for Timeline's work. Thus, Montage has been paid by DCSEC for all of the work, yet Montage has paid *nothing* to Timeline for Timeline's considerable work at the project. Again, Montage's only payment to Timeline was a check for the sod which Timeline required before providing additional sod; however, Montage issued a stop payment on that check almost immediately after Timeline's delivery of that sod. Not realizing that the check had been stopped, Timeline continued to water the

19

sod and mow for another 8 days after receiving the "payment."    Further, despite its contract

obligation to provide a joint check for the sod, no joint check was ever provided by Montage.

A review of the Alpine scope of work (attached to Montage Exhibit V), the description of

work as the items appear on that scope of work, which relate to Timeline's scope of work, are items

5, 18, 19, 21, and 34. All of those items are priced by Alpine for a total cost of $25,350.00. It is not

clear from the evidence what work Alpine in fact performed, but it is clear that most of Alpine's

work represented a different project that the project that Timeline agreed to perform under the

subcontract.

## CONCLUSION

Wherefore, for the foregoing reasons and for the reasons set forth at the arbitration of this

matter, TimeLine requests an Award in its favor, and against Montage, Inc. in the net amount of

$362,922.32 plus interest from July 14, 2005 and costs of this proceeding.

Respectfully submitted,

Adam M. Spence, Esq.
The Law Offices of Adam M. Spence, P.C.
409 Washington Avenue, Suite 1000
Towson, MD 21204
(410) 823-5003
Fax: (443) 836-9181
adam@spencefirm.com

- and -

Jim W. Nowak, Esq.
Francomano & Karpook
20 South Charles Street
Sun Life Building - 4th Floors
Baltimore, MD  21201-3217
*Counsel for Defendant/Counter-Plaintiff*
 *Timeline Construction Corporation*

20

<u>APP-1</u>
**Calculation of Imported Fill Material  Dirt based on Testimony of Ed Cheney**

<u>Calculation of Fill for Field Dimensions</u>

| | | |
|---|---|---|
| 360 A | | length |
| 310 B | | width |
| 2 C | | depth |
| 223200 D = A*B*C | | cubic feet |
| 33480 E= D*.15 | | add 15% to cubic feet for fluff because of compression on site |
| 256680 F = D + E | | sum of cubic feet of import fill on field dimensions |
| 27 G | | Number used to reduce cubic feet to cubic yards |
| **9506.667** H = F/G | | **Total Cubic yardage of import fill used on field dimensions** |

<u>Calculation of Fill for Outside Field Dimensions</u>

TLC also filled the fill area outside of field
dimensions from upper side of field goal post approximately 15' wide, 310' long at 2' deep

| | | |
|---|---|---|
| 15 I | | length |
| 310 J | | width |
| 2 K | | depth |
| 9300 L = I*J*K | | cubic feet |
| 1395 M = L*.15 | | add 15% to cubic feet for fluff because of compression on site |
| 10695 N = L + M | | sum of cubic feet of import fill outside field dimensions |
| 27 O | | Number used to reduce cubic feet to cubic yards |
| **396.1111** P = N/O | | **Total Cubic yardage of import fill used outside field dimensions** |

<u>Summary of Total Import Fill based on Evidence</u>

| | | |
|---|---|---|
| Total Cubic Yards of Import Fill | **9903** Q = H + P | |
| Total Cubic Yards Invoiced by TLC | **9760** Timeline Exhibits 13 & 14 | |
| Difference between testimony and invoices | **143** | |
| | | |
| Total Number of Trucks delivered | **1238** R = Q/8 | |

<u>ASSUMPTIONS:</u>

1. Ed Cheney testified that the imported fill covered the site with 2' of dirt
2. Playing Field dimensions were 360' by 310'