## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

|  |  |  |
|---|---|---|
| **TIME LINE CONSTRUCTION CORP.,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| v. | ) | **Case No. 16 110 00268 06** |
| | ) | |
| **MONTAGE, INC.,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### RESPONDENT, MONTAGE, INC.'S
### POST-HEARING MEMORANDUM

Respondent, Montage, Inc. (Montage), in response to certain questions[1] posited by the Arbitrator at the close of the Hearing, hereby submits this Post-Hearing Memorandum in the above-captioned matter.

**1.      The signed Subcontract governed the relationship between the parties, and the prior TLCC proposals must be disregarded in their entirety.**

The Subcontract (Exhibit 1) contained a so-called "integration" clause, by the terms of which all prior negotiations, proposals and agreements by and between the parties merged into and were obviated by the Subcontract. The integration clause in the Subcontract, at Paragraph 28, provides:

> This Subcontract . . . represents the entire and integrated agreement between the parties hereto, and supersedes all prior negotiations, representations, or agreement either written or oral.

---

[1] In preparing its Response, Montage has combined and rearranged some of the Arbitrator's issues for organizational purposes, while nonetheless confining its discussion in this Response to the issues presented by the Arbitrator.

The integration clause of the Subcontract is clearly enforceable under the law of the District of Columbia. *Daisley v. Riggs Bank., N.A.,* 372 F. Supp.2d 61 (D.D.C. 2005); Restatement (Second) of Contracts § 209(1).

In *Daisley*, the plaintiff had signed an offer letter in connection with his employment with the defendant bank. The offer letter was silent as to the term of employment, but the plaintiff contended that his agreement to sign letter based upon an oral agreement with the bank that he would be employed for a minimum of six years. The court, applying DC law, granted the bank's motion to dismiss on that issue, excluding the plaintiff's purported oral understanding in light of the signed offer letter. The court stated, "Where the parties to a contract have executed a completely integrated written agreement, it supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties, whether consistent or inconsistent" with the integrated agreement. *Id.,* at 77, *citing Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996). An "integrated" agreement is a writing constituting the final expression of one or more terms of an agreement. To determine whether an agreement is "integrated" requires examining the intent of the parties at the time the agreement was executed. *Id.* However, rather than consider extrinsic evidence in that effort, the first and most important step in ascertaining that intent is examination of the contract itself. If the document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties intent. *Id., citing Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 927 (D.C. 1992).

In the case at bar, the Subcontract is the document which governs the relationship between the parties, and Time Line Construction Corp.'s (TLCC) antecedent proposals must be disregarded in their entirety. It is undisputed that TLCC submitted to Montage an initial proposal

2

concerning a broader scope of work to be performed (Exhibit 22). As the owner, the District of

Columbia Sports and Entertainment Commission (DCSEC), and the design engineer, Alphatec,

Inc. (Alphatec), deleted certain items for budgetary reasons, Montage requested that TLCC

submit modified proposals (Exhibits 23 – 24) with a commensurately reduced scope of work and

price. According to the testimony of both Jackie Coalson, TLCC's president, and Edward

Chaney, Montage's project manager, once the scope was settled, they met at Montage and

together prepared the final Subcontract on Mr. Chaney's computer.

The Subcontract included the new price, a statement of the work, and terms of payment –

a complete agreement. The respective rights and obligations of the parties were unambiguously

set forth under the Subcontract. Under DC law, the parties agreed to and executed a completely

integrated agreement, and that document plainly controls the relationship of the parties, to the

exclusion of any prior written or oral proposals or agreements. *See Patterson v. District of

Columbia*, 795 A.2d 681 (D.C. 2002) (written language of contract governs the parties' rights

unless it is not susceptible of clear meaning); *Double H Housing Corp. v. Big Wash, Inc.*, 799

A.2d 1195 (D.C. 2002) (District of Columbia adheres to the "objective law" of contracts, which

means the plain written language will govern the rights and liabilities of the parties in the

absence of fraud, duress or mutual mistake).

In order to avoid its responsibilities and defaults under the Subcontract, TLCC contends

that the parties intended to rely only upon the last TLCC proposal (Exhibit 24), and Mr. Coalson

asserts that Mr. Chaney told him the Subcontract was only a formality Montage home office

required for payment. As a threshold matter, TLCC offers no evidence to support that assertion.

Mr. Coalson was not able to explain why Montage would require TLCC to execute a contract

form that it did not intend to enforce. Moreover, that assertion is obviously incongruent with the fact that the parties took the time to finalize the Subcontract terms on Mr. Cheney's computer, including negotiation of the handwritten modifications to the payment provision, which change they separately initialed to indicate each party's approval. Further, Mr. Coalson never explained why he bothered to "back-date" the Subcontract if he really believed that it was to have no legal effect.

Even assuming *arguendo* that Mr. Chaney had told Mr. Coalson that he only needed to sign the Subcontract to satisfy Montage's home office, Mr. Coalson could not have relied upon that assertion as a matter of law. In order to prevail under such circumstances, TLCC would have to establish that Mr. Chaney had the actual authority to bind Montage. *Blackman v. Hustler Magazine, Inc.*, 620 F. Supp. 1501 (D.D.C. 1984) (for an agent to bind a principal to agreement with a third party, the agent must have had actual authority from the principal to execute final contract). However, Mr. Chaney's immediate supervisor, Nela Lugo, Montage's Operations Manager at the time, unequivocally testified that Mr. Chaney did not have the authority to execute any subcontracts or issue any changes to subcontractors on projects he managed for Montage. And, other than TLCC's unsupported assertion, there is nothing in the documentary record nor any testimony that would controvert Ms. Lugo's description of Mr. Chaney's actual authority.

Accordingly, TLCC would have to argue that TLCC somehow relied upon Mr. Chaney's "apparent authority" to believe the Subcontract was not to be of any effect. Apparent authority focuses on manifestations of the principal to third parties concerning the authority of the agent. *Evans v. Skinner*, 742 F. Supp. 30 (D.D.C. 1990). To support a finding of apparent authority, it

4

is essential that the principal have done something to mislead the third party into believing that the agent is clothed with authority which he in fact does not possess. *Maurice Electric Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.*, 632 F. Supp. 1082 (D.D.C. 1986). Under the doctrine of apparent authority, as applied under DC law, even if it is established that the principal was negligent in that regard the court must also consider whether it was reasonable for the third party to have concluded the agent had the necessary authority. *Novecon, Ltd. v. Bugarian-American Enterprise Fund*, 967 F.Supp. 1382 (D.D.C. 1997) (apparent authority exists only to the extent that it is reasonable for third person dealing with agent to believe that agent is authorized to act for principal.); *Gonzales v. Internacional De Elevadores, S.A.*, 891 A.2d 227 (D.C. 2006). TLCC offered no evidence to even suggest such action by Montage, and, on the contrary, TLCC obviously knew that Mr. Chaney did not even have the power to sign subcontract agreements. The only testimony on the issue was also by Ms. Lugo, who stated that she had to review and approve all subcontracts, and the only persons with authority to sign such agreements were the president, Sina Moayedi, and the former chief financial officer, Nader Golpa.

It is also notable that Mr. Coalson's testimony on this point, if it could be believed, would actually undermine any apparent authority argument by TLCC. If Mr. Chaney really told Mr. Coalson to sign the Subcontract to placate Montage' home office, Mr. Coalson then would have to have known that Mr. Chaney did not have the authority to waive the Subcontract or to bind Montage to TLCC's last Letter of Intent. Instead, Mr. Coalson would have to have understood that Mr. Chaney was misleading Montage's home office, an act that would be clearly outside the scope of his apparent, as well as actual, authority, and, under such circumstances, Mr. Chaney could not have bound Montage as a matter of law.

5

2.    **The law of the District of Columbia is the proper law of the case.**

Under any applicable conflicts of laws standard, the law of the District of Columbia applies to the Subcontract and relationship of the parties. Under the earlier approach of District law, the place where the contract is made would determine which law applied to the interpretation of that agreement. *See, e.g., Croissant v. Empire State Realty Co.,* 29 App. D.C. 538 (1907) (validity of a contract is determined by the law of the place where it is made); *Bayside-Flushing Gardens v. Beuermann,* 36 F. Supp. 706 (D.D.C. 1941) (law of the place of the contract governs all matters of substantive law affecting a contract, and the law of the forum governs all matters of procedure). In the case at bar, Mr. Coalson and Mr. Chaney testified that they negotiated and finalized the terms of the Subcontract on Mr. Chaney's computer, in his office at Montage in the Washington, DC.

Although the above approach has not been expressly rejected, in more recent cases some courts have considered the following broader range of factors in addressing DC conflicts issues: (1) where the contract was negotiated; (2) where the parties contracted; (3) the citizenship and place of business of the parties; (4) the place of performance; (5) the location of the subject-matter of the contract. Restatement (Second) of Conflict of Laws § 188; quoted in *Samra v. Shaheen Business and Investment Group, Inc.,* 355 F. Supp. 2d 483, 494 (D.D.C. 2005). Here, it is undisputed that the Subcontract was negotiated in Mr. Cheney's office in Washington, D.C. and Mr. Golpa, Montage's CFO, later signed it there as well. Further, while TLCC is a Virginia corporation located in Springfield, and Montage is incorporated in Maryland, Montage's principal place of business is located in Washington, Montage is licensed and pays taxes in the District, and it is, in part, a citizen of the District.

6

Of the above five factors, under District of Columbia law, the factor of greatest importance for a choice of law inquiry in a contract action is where the parties were to perform their respective obligations under the agreement. Restatement (Second) of Conflict of Laws § 188; *Samra*, at 494. Here, it is agreed that the work was to be performed exclusively – and, in turn, the "subject matter" of the agreement was located – in the District of Columbia. On these facts, the law of the District of Columbia clearly applies to the Subcontract and relationship of the parties.

**3.    TLCC's Subcontract was properly terminated by Montage.**

The Subcontract includes a clause which sets forth the grounds for default and termination of the subcontractor by Montage.[2] That clause also provides that Montage will give three days written notice of the circumstances of default before the Subcontract is thereafter terminated for default. In the case at bar, Montage gave TLCC written notice of its pending termination for cause, and, *13 days* after such notice, Montage terminated the Subcontract for cause. It is notable, too, that after notice to TLCC, Montage had agreed to consider rescinding the termination decision if TLCC could submit a plausible plan to recover its performance by a date certain. However, consistent with TLCC's performance throughout the Project, TLCC

---

[2] The termination clause provides, in pertinent part:

15.1 <u>Causes for Termination.</u> If, in the opinion of MONTAGE, Subcontractor shall, at any time: (1) refuse or fail to provide sufficient properly skilled workmen or materials of the proper quality; (2) fail in any respect to prosecute the work according to the current schedule;. . . (6) otherwise fail to comply with all provisions of this Subcontract or the Contract Documents then, after serving three (3) days written Notice, unless the condition specified in such Notice shall have been eliminated within such three (3) days, MONTAGE, at its option: . . .

b. Terminate the Subcontract for default; . . .

submitted its plan after the deadline, and the plan it submitted was patently inadequate, failed to

address many of the problems at the Project, and was conditioned upon Montage advancing it

monies despite the unambiguous payment provision of the Subcontract.  As a result, the

Subcontract was properly and timely terminated for default.

A wrongful or groundless default termination is itself a breach of the contract.  *McClain*

*v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 198-99 (Tenn. Ct. App. 1990).  Generally, where

there is a wrongful termination, the terminated party is relieved of liability for any prior breaches

of the contract by the terminated party.  Further, the agreement requires a notice to the defaulting

party in advance of termination, a failure to issue the notice, or to provide a defective notice, may

invalidate the termination.  *See, e.g., Miree Painting Co. v. Woodward Constr. & Design, Inc.,*

627 So. 2d 389 (Ala. Civ. App. 1992) (punch list not a cure notice or termination notice, and

absent proper cure notice required by the contract, termination wrongful), *rev'd on other*

*grounds,* 627 So. 2d 393 (Ala. 1993); *Cuddy Mountain Concrete v. Citadel Constr., Inc.,* 824

P.2d 151 (Idaho Ct. App. 1992) (owner breached contract by terminating contractor for default

without providing contractually required written notice).

However, a cure or other notice provision in a contract is not to be applied so vigorously

that a default is excused where the terminated party had actual notice of its default and an

opportunity to cure, consistent with the contract.  The actual question for the factfinder then is

whether the contractor had adequate notice of the reason for default termination in order for the

termination to be proper. *Composite Laminates, Inc. v. United States,* 27 Fed. Cl. 310 (1992).  To

be adequate, the notice should include "with enough particularity the performance failures which

have placed the contract in danger of termination for default." *Hannon Elec. Co. v. United States,*

8

31 Fed. Cl. 135, 148 (1994), *aff'd,* 52 F.3d 343 (Fed. Cir. 1995). It must reasonably apprise the contractor of the specific defaults upon which the other party intends to rely in terminating the contract if the defaults are not cured. *Blaine Econ. Dev. Auth. v. Royal Elec. Co.,* 520 N.W. 2d 473, 477 (Minn. Ct. App. 1994). If it is a "cure" notice, it need not be identified as such by name. It need only "describe the inadequate performance and must fairly advise [the contractor] that [the owner] considers the inadequate performance serious enough that, without prompt correction, the contract will be terminated." *Id.*

On our facts, it is obvious that Montage provided more than sufficient notice of the grounds for default. In fact, here, even though the provision does not prescribe a cure period, Montage offered TLCC the opportunity to submit a plan for rectifying its default and recover performance. On July 1, 2005, Montage's attorney sent a letter to Mr. Coalson, in which Montage stated its intention to terminate the Subcontract as a result of TLCC's failure to complete its work at the Project or to properly perform the work it had provided:

> Unfortunately, TLC has failed to timely prosecute its work . . . the Subcontract completion date has long passed . . . much of TLC's work on the Project is not in compliance with the plans or specifications for the Project and has failed three separate inspections . . .

(Exhibit M.) Montage's counsel and its project personnel also attended a meeting that day with Mr. Coalson and reviewed each of the performance problems at the job site. In addition, we know that Mr. Coalson had previously participated in at least one of the inspections performed by the DCSEC, during which TLCC's work was criticized and rejected, since, as noted in the July 1 letter, it was during the last of those inspections that Mr. Coalson had verbally assaulted the COTR on the Project, Clark Ray.

9

The adequacy of a contractually required notice is measured by whether the contractor actually has been made aware of the deficiencies in its performance. *See, e.g., Lanzen Fabricating, Inc.*, ASBCA No. 40328, 93-3 BCA (CCH) ¶ 26,079 (1993). From the July 1 correspondence Mr. Coalson received, and the context of the inspections and the meeting with Montage, it is undeniable that TLCC understood the reasons for its pending termination. In fact, when confronted on cross-examination with the inspection reports and other evidence memorializing the grading, drainage, sod and infield completion issues, Mr. Coalson admitted that he was aware of the alleged deficiencies – which he characterized as mere punch list items – and he was hard pressed to maintain that, on July 1, he did not know why TLCC was threatened with default termination.

Moreover, it was obvious from the photographs, reports and oral testimony that the problems that led to TLCC's termination had existed for a quite some time prior to Montage's July 1 letter to Mr. Coalson. Certainly, the incomplete infield grading and pitcher's mound, netting on the sod, rocks and boulders, and ponding throughout the outfield all existed and were well known to TLCC at least as of the Media Day events on May 16.

4. **TLCC's proposed change orders, even if proper, were barred under the Notice of Claims provision of the Subcontract because they would have been untimely under the Changes Clause of Montage's Contract.**

Even if the proposed change orders Nos. 9 through 14 (Exhibits 11 – 16), allegedly prepared by TLCC on June 28, 2005, were submitted to Montage on or after that date,[3] they were

---

[3] Mr. Deane and Mr. Coalson each testified that although the proposed change orders were dated June 28, 2005, neither was exactly sure when they were sent to Montage. The only definite testimony on that point was by Mr. Chaney, who testified that he did not receive them until after TLCC was defaulted. Montage emphatically contends that Mr. Chaney is correct. However, we will use June 28 as the relevant date for the purpose of discussion of notice here.

10

untimely and barred under the terms of the Subcontract. Paragraph 7.2 of the Subcontract provides that "[A]ny claims for adjustment in price, time or other Subcontract provisions, shall be submitted to Montage, in writing, in sufficient time for Montage to submit claims to Owner in accordance with" the Contract. Under the terms of Montage's Contract, the articles and clauses of General Services Administration (GSA) contract numbered GS11P99MOQ0013 were incorporated into the Contract with the DCSEC, including Federal Acquisition Regulation (FAR) provision 52.234-4, the so-called Changes Clause.

The Changes Clause requires written notice to the contracting officer of any additional costs incurred as the result of any change order, whether formal or constructive. 52.234-4 (b). The notice must be timely and clearly state the nature of the claim. If the change impact results from a formal written change or directive of the owner – such as the DCSEC's deletion of the underground drains – the notice requirement of paragraph (e) of the Changes Clause must be followed. Paragraph (e) requires the contractor to submit written notice to the contracting officer within 30 days of receipt of the change order upon which it bases its claim. The notice must inform the government of the contractor's intention to assert a claim for costs incurred as a result of the change.

Written notice to the government is also required where the contractor claims increased costs resulting from a constructive change. Under Paragraph (b) of the Changes Clause, the contractor must notify the contracting officer in writing that it contends a constructive change had been directed, stating the date, circumstances and source of the directive. Although there is no deadline for submitting the notice, as a practical matter the contractor must promptly notify the government because under Paragraph (d) of the Changes Clause as the contractor's recovery

11

is limited to costs incurred within the last 20 days prior to the notice.  Additionally, the notice

requirement of Paragraph (e), discussed above, applies to constructive changes, so within 30 days

of the purported constructive change the contractor must also give the contracting officer a

written statement setting forth the general nature and monetary extent of this claim.

As a threshold matter, TLCC's purported claims could not be reasonably characterized as

arising from either a formal change order or a constructive change.  TLCC could not have

asserted an impact claim resulting from either a formal change or a constructive change since the

DCSEC change order that TLCC argues necessitated the placement of extra fill, the deletion of

the underground drains, was issued and the drains were excluded from TLCC's scope of work

*before* TLCC entered into the Subcontract with Montage.

If *arguendo* TLCC could have properly asserted such a claim, TLCC failed to provide

sufficient notice to Montage such that Montage could timely notify the government under the

Changes Clause.  If TLCC's purported claims resulted from a formal change order, the notice

requirements of Paragraph (e) would apply to bar those claims.  TLCC did not submit its

proposed change orders until, at the earliest, June 28, more than three months after the change

was issued and incorporated into the Contract and Subcontract.  Similarly, any claims resulting

from a purported constructive change would also fail for lack of timely notice to Montage, and,

in turn, to the government.  The street sweeping expense was allegedly incurred by TLCC in

connection with its work in April and the first half of May.  The placement of the borrow fill and

dugout excavation were performed prior to the Media Day, on May 16, 2005, and the

replacement sod was allegedly laid before the end of May.  Under Paragraph (d), Montage could

not recover any of those costs because they were purportedly incurred more than 20 days prior to

12

any written notice to the government. Accordingly, any claim by TLCC to Montage for such costs would be untimely under Paragraph 7.2 of the Subcontract since any such claim by Montage to the DCSEC would be untimely under the Changes Clause of the Contract.

There are three well established exceptions where the failure to strictly adhere to the notice requirements will not be fatal to the equitable adjustment claim: (1) where the government had actual notice of the claim; (2) the contracting officer failed to raise the defense of notice in considering the claim; (3) the government was not prejudiced by the lack of notice. *See, e.g., Korshoj Construction Co.*, IBCA 321 (1963) BCA ¶ 3848. None of those exceptions could apply here, however, since there is nothing in the record to suggest that the DCSEC had any prior knowledge of the circumstances of the claim, and the contracting officer has never issued any decision on any of TLCC's alleged claims. Meanwhile, the DCSEC clearly would have been prejudiced by the lack of notice in evaluating the extra fill claims since to succeed on that claim Montage would have to have shown that the original slope of the athletic field was less than the 2% slope shown on the drawings and insufficient for the contemplated drainage. However, by the time that TLCC asserted its claims in connection with the fill TLCC had purportedly completed its rough grading of the site.

5. **TLCC's proposed change orders were barred under the Notice of Claims provision of the Subcontract because they also would have been untimely under the Differing Site Conditions Clause of Montage's Contract.**

TLCC's proposed change orders 11 and 13 (Exhibits 13 and 15) would be barred under the notice requirements of the Subcontract because they would have been untimely under FAR 52.236-2, the so-called Differing Site Conditions Clause, which was also incorporated into Montage's Contract. That clause states in relevant part:

13

> (a) The contractor shall promptly, and *before the conditions are disturbed*, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, . . . (c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required [in paragraph (a)] . . .

[Emphasis added.]

Unlike with the Changes Clause, the requirements of the Differing Site Conditions Clause are strictly applied. It is uncontroverted that TLCC did not provide any such written notice before delivery of the extra fill to the project. Indeed, as we now know, TLCC could not have provided the required notice in any event because the physical conditions at the site did not actually differ from the conditions contemplated in Montage's Contract or the Subcontract.

### 6.     Neither Mr. Chaney nor Montage waived the Notice of Claim or the payment provisions of the Subcontract.

In its pre-hearing statement, Timeline argues that it is an "elementary principal of contract law that a provision in a written construction contract limiting the right of one party to make a claim except on a written order of the party against whom the claim is made can be waived by the conduct of that party," citing *Charles Burton Builders, Inc. v. L & S Const. Co.,* 260 Md. 66, 271 A.2d 534 (1970). While TLCC correctly states the law on that point (at least in Maryland), TLCC has failed to establish any of the predicate elements for such a waiver to be found.

In *Charles Burton*, the contract at issue required a written change order or certification as a condition precedent to payment for extra or changed work. The appellate court concluded that the provision, while valid and enforceable, was waived by the owner because its general superintendent had authorized the extra work and the owner's engineer had recommended that the work be accepted. In contrast, Montage never authorized the extra work nor did the owner

14

approve or accept TLCC's purported "extra" work. Indeed, at the time Mr. Coalson told Mr.

Chaney that TLCC did not intend to charge Montage for the fill it was importing.

TLCC's reliance upon *Freeman v. Stanbern Const. Co.,* 205 Md. 71, 106 A.2d 50 (1954)

is also misplaced. In *Freeman,* a subcontractor was engaged to do landscaping work at a public

housing project, including planting shrubbery. Under the terms of the subcontract, the shrubbery

was required to survive at least one growing season and be approved by the owner. The

subcontractor contended that the contractor ordered him to plant the shrubs earlier than planned,

thus waiving the shrub guaranty. The subcontract included a no-oral-modification clause. The

court held that such a clause could be waived by implication. However, the court also stated that

it must appear from facts that the waiver was knowing:

> A subsequent oral modification of a written contract may be established by a
> preponderance of the evidence . . . Of course, if the written contract provides that
> it shall not be varied except by an agreement in writing, it must appear that the
> parties understood that this clause was waived.

205 Md. 71, 79, 106 A.2d 50, 55.

TLCC asserts that because Montage did not default TLCC when it failed to finish its

work on time, Montage somehow waived the Payment provision, including the requirement that

the work be completed and approved by the Owner before any payment was due to TLCC.

However, there is nothing in the record to suggest a knowing waiver by Montage. The

uncontroverted testimony of Mr. Chaney confirmed Montage's displeasure with TLCC's failure

to complete its work prior to Media Day and its frantic efforts to "dress up" the field the night

before that event. In addition, Montage refused to accept the work or pay TLCC while TLCC

continued to failure DCESC's subsequent inspections in May and June. While Montage may

have had good grounds to terminate TLCC earlier, TLCC offered no testimony or other evidence that would indicate *any* intention by Montage to waive TLCC's performance failures.

> 7.    **Even if Montage's project manager did not timely object to TLCC's importation of the fill, such lack of objection created no obligation to pay TLCC for that work.**

Mr. Chaney's testified that prior to delivering the imported fill to the Project, Mr. Coalson told Mr. Chaney that the extra fill was needed to "correct" the purported drainage problems with the design. TLCC did not challenge that testimony. Of course, upon a cursory review of the project plans, and with the testimony of Grove Teates, president of Alpine Services, Inc. (Alpine), it was established that there was actually nothing wrong with the existing grade, even after deletion of the outfield drainage system. In fact, on cross-examination Mr. Coalson admitted that TLCC was actually paid by a third party, Anderson Excavating (Anderson), to dispose of that fill on the job site. Further, TLCC did not contend that Mr. Chaney or Montage ever agreed pay for the fill. Instead, Mr. Coalson testified that he had told Mr. Chaney Montage would not be charged for the fill if TLCC was awarded the Kenilworth project. Montage denies that it had any such agreement with Mr. Coalson. However, even if that were true, the DCSEC cancelled the Kenilworth project before a construction contract was ever awarded. Mr. Coalson attended the pre-bid conference for both the Kenilworth and Ft. Greble projects, so he knew that Montage did not have the construction contract for Kenilworth. Accordingly, even if TLCC had (unilaterally) agreed to charge Montage only if it awarded the excavation work for the Kenilworth project to a subcontractor other than TLCC, in making that offer Mr. Coalson clearly would have assumed the risk that, as actually happened, the DCSEC

never proceeded with that project past the initial design phase and did not award a construction contract for the Kenilworth project.

Of course, even if Mr. Chaney had actually reached such an agreement with TLCC, and the failure of the purported consideration for a promise by TLCC was somehow not TLCC's responsibility, for the same reasons discussed above Mr. Chaney had neither the actual nor apparent authority to so bind Montage. Mr. Chaney could not approve, execute or modify subcontracts for Montage. Moreover, Montage did nothing to suggest Mr. Chaney had the apparent authority to bind Montage, and, for the foregoing reasons, it was not even reasonable for TLCC to subjectively believe that Mr. Chaney had any such authority.

8.    **The Specifications were applicable to TLCC despite the changes and deletions by the DCSEC.**

The changes and deletions to the Specifications did not effect the efficacy of that document because the changes and deletions were discrete and identifiable and did not create any ambiguities that would effect the performance of TLCC's Subcontract. Moreover, even if TLCC could have claimed that it subjectively believed there was such an ambiguity, it would have been resolved or reconciled by the scope of work of the Subcontract.

Further, the absence of any such ambiguity is supported by the fact that TLCC never submitted a request for information (RFI) in connection with any aspect of its work on the Project. In fact, at trial TLCC never alleged or proved that it had ever submitted a question to Montage concerning the specifications or its work thereunder.

17

Finally, it should be noted that all of the changes and deletions that may have impacted the Specifications occurred *before* TLCC executed its Subcontract, and TLCC has never alleged that the DCSEC made any changes after TLCC started work.

9.    **The scope of work originally subcontracted to Montage's replacement contractor, Alpine, was identical to the work required of TLCC under its Subcontract.**

Although the Alpine scope of work was presented in a slightly different format because its July 19 letter proposal (Exhibit T) was incorporated into its subcontract with Montage (Exhibit U), all of the work required of Alpine was included in TLCC's scope of work in the Subcontract, with the exception of the items required to correct TLCC's work. The installation of the basepaths, skinned area material (calcine clay and ball diamond mix), pitcher's mound, home plate, dugouts and sod in the Alpine agreement were all required under the Subcontract. The grading of the outfield and infield, including the "wing areas," were also part of the Subcontract - the only difference being that much of the grading performed by Alpine in the outfield was *restoring* the proper grades, while the infield grades had never been completed nor were the proper elevations ever achieved by TLCC.

The corrective work performed by Alpine was also necessitated by TLCC's failures and concerned items clearly within the Subcontract. The existing sod was dead or dying, and the netting could not be left on the sod even if it could have survived. In addition, as Mr. Teates testified, the sod had to be taken up for the re-grading and could not have survived to be relaid.

The temporary irrigation in Alpine's subcontract was simply identified as "water as necessary to insure proper germination" in the TLCC Subcontract. The only difference was that TLCC used hoses with nail holes punched in them, while Alpine employed an irrigation pump

18

and the proper method to irrigate the grass for the requisite germination period. Montage paid for the irrigation pump under a separate change order, for which Montage is *not* seeking reimbursement from TLCC.

Finally, TLCC and Alpine were both required to fertilize the green areas under their respective agreements. The compost Alpine proposed to add for humus under its original proposal was later included and paid for in a process called the "Alpine sandwich." Although Montage arguably should recover that cost from TLCC since it was needed because of the bad soil brought on site by TLCC, as Ms. Lugo testified, the "sandwich" was also paid for by Montage under a separate change order for which Montage is not seeking payment from TLCC.

10. **As a result of TLCC's default, Montage has suffered damages totaling $66,701.49.**

Montage engaged Alpine to repair and complete TLCC's work on the Project. Regretfully, TLCC provided almost no value to the Project, and Alpine had to replace almost all of the work that TLCC had performed. Most of the sod laid by TLCC was dead and had to be replaced. Even if the sod had survived, the plastic netting in which the sod was transported was not removed by TLCC, and the protruding netting created a severe safety hazard, requiring the removal and replacement of the sod.

TLCC had also failed to properly grade the outfield or infield. As noted by Alphatec in its July 1 report, the grading was so poor that water was "ponding" throughout the outfield and the grass was literally becoming moldy. The basepaths were the wrong relative elevations, and the pitcher's mound had not been installed at all. TLCC's "completed" slope for both the outfield and the infield were contrary to the Project plans. In addition, TLCC had left huge

19

stones, many the size of deflated footballs, throughout the fill. These stones were working themselves up from the fill, creating an additional tripping hazard in the field of play.

Under such circumstances, Alpine had to remove and replace all of the sod and re-grade the entire field. It also had to rebuild the infield, including the basepaths and missing pitcher's mound, and install the missing basepath materials. Meanwhile, we now know that the pre-construction slope was correct, and, contrary to what Mr. Coalson told Mr. Chaney, the original field had sufficient surface drainage. Accordingly, not only did Alpine have to redo most of TLCC's work, but the imported fill placed by TLCC added nothing to the Project.

As a result of TLCC's default under the Subcontract, Montage paid Alpine $136,900 to correct and complete TLCC's work, including $29,256 to replace all of the dead sod at the site. In addition, because TLCC's failure delayed Montage's completion of the Project Montage incurred quality control costs of $5,000, extended home office overhead expense of $54,246.57, and extended field overhead costs totaling $10,554.92. After crediting TLCC's contract amount of $140,000, Montage suffered net losses, costs and expenses totaling $66,701.49, as a result of TLCC's default.

Respectfully submitted:

Eric R. Stanco
Stanco & Associates
126 C Street, N.W.
Washington, D.C. 20001
(202) 331-8822
(202) 331-9705 (facsimile)

Counsel for Respondent, Montage, Inc.

20