BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| TIME LINE CONSTRUCTION CORP., )<br>　　　　　　　　　　　　　　　　　　　)<br>　　　　　　　　　Claimant, 　　　　　　　)<br>　　　　　　　　　　　　　　　　　　　)<br>v.　　　　　　　　　　　　　　　　　　) 　　Case No. 16 110 00268 06<br>　　　　　　　　　　　　　　　　　　　)<br>MONTAGE, INC.,　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　　　)<br>　　　　　　　　　Respondent.　　　　　　)<br>_____) | |

## MONTAGE, INC.'S REPLY TO CLAIMANT'S POST-HEARING MEMORANDUM

Respondent, Montage, Inc. (Montage), replies to the Post-Hearing Memorandum of Time Line Construction Corp. (TLCC) as follows:

1.　　TLCC misstates the dimensions and conditions of the field in connection with the quantity of fill dumped at the site by TLCC:

- It was undisputed that the actual maximum field dimensions were 360' x *255'*, not 360' x 310'. (It was understood that there was a discrepancy in the drawing, and the actual dimensions were verified at the hearing by using the drawing *scale*.) Then, even applying TLCC's flawed formula, 360 x 255 x 2 = 183600 c.f. (6800 c.y.), not 223,200 c.f.[1]

- Edward Chaney did not testify that TLCC added 2' of fill to the "entire site," as asserted in TLCC's Appendix, and Ray Deane emphatically described the fill as creating a "crown" in the middle and feathered to its edges.[2] (In contrast, TLCC's calculations assume the fill applied as a 2' deep "box" layered onto the field.) We also know that there was no fill at the edges because the photographs would have shown the bases of the pre-existing light poles buried by two feet.

- Assuming that the fill really was 2' deep at its center, a different formula is appropriate, whereby you must assume that the length is at most an *arc* and the *edges* of the installed fill is 0' above original grade. Thus, the proper calculations and resulting quantities are:

---

[1] TLCC presented no testimony regarding the inclusion of a 15% "fluff factor" in these calculations and should be disregarded.

[2] Indeed, it is notable that Deane asserted that the fill was required to correct a "heart attack hill" found in the original field grade, while Jackie Coalson said there was inadequate drainage.

Arc length 255.0830' x radius 4065.0830 = 1,036,933.5669' (A). Then, after deducting a constant of 2 from the radius, multiply the result by the width 255' = 1,036,086.1650 (B). A - B = 847.4019 ÷ 2 = 423.7009. 423.7009 x 360' = 152532.3400 c.f. ÷ 27 = **5649.3459 c.y.**

    2.    TLCC mischaracterizes the deleted drains and irrigation impact and relevance:

- The modification deleting the outfield drains were not by Montage. Although James Heltman was not aware of it at the time, his boss, Anthoula Giantolis, and the DCSEC contracting personnel - not Montage - deleted the drains and irrigation system.

- TLCC's assertion that the deletion of the drains necessitated the importation of fill is plainly not true. It was undisputed that the <u>original</u> site conditions had a 2% slope, and both Mr. Teats and Heltman testified that 2% for drainage, without underground drains, was within appropriate standards for an athletic field.

- The deletion of the drains and irrigation system was done before TLCC executed the Subcontract, with TLCC's knowledge, and its subcontract price was adjusted accordingly.

- The "swale" installed by Alpine was to drain away the water sheeting from the adjacent upper field onto the baseball field, and is not relevant to the grade slope of our project.

- Under the Subcontract, TLCC knew it had to provide temporary irrigation until the job was accepted by the DCSEC. Meanwhile, the need for the extended watering was due to TLCC's failure to finish in April, as scheduled, when it is usually cool and wet here.

    3.    TLCC mischaracterizes the Alphatec report and testimony of Heltman:

- Alphatec's July 7 report did <u>not</u> say that "the deletion of the drainage system by Montage resulted in numerous 'bird baths'." (See TLCC's Memorandum, p. 5.) Instead, it is obvious from the context and Heltman's testimony he actually meant that although the grading appeared to be generally conforming, there were "bird baths" in the infield and outfield, which he described as a "serious problem."

- TLCC attempts to misinterpret the report as saying that the deletion of the drains caused the bird baths. Meanwhile, it is clear he meant the bird baths were even more of a problem without the underground drains. He was not minimizing TLCC's improper grading. Indeed, Heltman concluded his testimony by noting that TLCC's work was the "worst he had seen" in his professional experience.

    4.    Montage did not achieve a windfall as a result of TLCC's alleged extra work, and TLCC fails to establish any *quantum meruit* right to payment:

- It is undisputed that Montage received no extra money from the DCSEC for the imported fill. In contrast, Anderson Excavating paid TLCC to dispose of that fill taken from a project at the Naval Research Laboratory. (It is also notable that Coalson had never revealed that TLCC had been paid to dispose of the fill until Montage learned of the Anderson payment and confronted Mr. Coalson at the hearing.)

- It is undisputable that, contrary to Coalson's representations to Chaney, the fill was not needed and did not add any value to the Project.

- Coalson admits that it told Chaney that TLCC was providing the fill without any expectation of payment from Montage.

5.　TLCC made several miscellaneous misrepresentations regarding the topsoil:

- The Subcontract required 2" of topsoil, not "less than 1(inch)." (See Memorandum, p. 6.)

- Chaney actually testified that because the sod comes with 1/2 inch of topsoil it was acceptable to reduce the topsoil to 2 inches, not 1/2 inch.

- The problem referred to by Heltman was that the sod and fill <u>chosen by TLCC</u> contained too much clay.

6.　TLCC asserts that the completion date in the Subcontract had already passed when the Subcontract was executed. Actually, TLCC signed the Subcontract on April 1, 2005 (and backdated it for some reason), and the completion date was April 28, 2005.

Respectfully submitted:

MONTAGE, INC.
By its attorneys:

_____
Eric R. Stanco
Stanco & Associates
126 C Street, N.W.
Washington, D.C. 20001
(202) 331-8822
(202) 331-9705 (facsimile)

3